Good morning. If it may please the court, my name is Fung Lee. I'm the counsel for the petitioner. At this time, I'd like to reserve one minute for rebuttal. In this case, substantial evidence doesn't support the IG's finding that Reddy is ineligible for asylum because although she suffered multiple attacks, there's no showing of nexus and that there's no showing that the government was unable or unwilling to help her. Here, although the IJ correctly notes that she suffered multiple instances such as being assaulted at home, her mother being slapped and beaten by ethnic Fijians, that she was molested at night in front of her mother, the IJ just sees these incidents as private criminal acts by private individuals. What the IJ doesn't mention is that these attacks occurred in May of 2000 when there was a coup in Fiji. At that time, a group of ethnic Fijians led a coup that overthrew the government and took the prime minister hostage, and it was the first Indian Fijian prime minister elected. So Reddy's claim has to be analyzed in the context of that. And as the Department of State's country reports say, Fiji, unfortunately, has a long history of systematically targeting its Indian Fijian citizens. And in a case like this where every single time that Reddy and her mother were persecuted, the ethnic Fijians told them that the reason why we're doing this is that you don't belong in Fiji, the land belongs to Fijian people, and that you should return to your home country in India. And this is the type of situation described in the Department of State's country reports. The BIA affirmed and adopted the findings of the IJ, correct? Yes, Your Honor. So we look to the IJ's findings in terms of our review? Yes, Your Honor. And in terms of past persecution, what did the IJ focus on? Well, in terms of past persecution ---- Not the facts, but my impression from reading it so you can focus on the question is that the IJ focused on political opinion and not racial animus. Is that a fair description? That's correct, Your Honor. And it's surprising that she does that. Did her claim have anything to do with politics? No. Her entire claim is based on racial persecution in light of the 2000 coup in Fiji that she and her mother as Indian Fijian landowners were specifically targeted and evicted by ethnic Fijians. But the IJ, despite claiming that she considered all the evidence in the record, including her application, testimony, and documents, basically dismisses it as a political opinion claim. But Reddy never sought asylum based on political opinion. It is based on race. And you see this in the record, too, such as on page 71, where a person can check one of five boxes for their asylum claim. And it's notable that she checked every single box but political opinion, but the IJ only focuses on political opinion. And the persecution that she suffered isn't as what the government characterizes it, that it's just generalized lawlessness or that it's just a mere land dispute, as the Department of State's country reports say. Although ethnic Fijians own 80 to 90 percent of the land, they still have been trying to forcibly evict Indian Fijians off the land for many years. And part of this is because to ethnic Fijians, their personal identity is closely tied to their land. So part of the reason why there's been long racial tension between the two groups is that ethnic Fijians don't want Indian Fijians owning their land. And here Reddy and many other people like her were forced to leave their land during this time. I think the Department of State's reports say over 200 of them were forced to leave and were just relocated to squatter homes. And it's not the judge's wrong in claiming that these were just criminal acts by private individuals, because here other Reddy reported these incidents to police on multiple occasions. The police were clearly unable or unwilling to help them. The police told her that while the land belongs to Fijian people, you're not one of us and that you should return to your home country, India. It's not an instance where, as the government claims, that she gave a vague description. The reason why they didn't help her is because they didn't want to. Did they say that or words to that effect? I mean, is that a conclusion you're drawing or is that? Words to that effect. But they clearly didn't want to help her. And they did say that you're not one of us, that the land belongs to Fijian people, and that's why they didn't want to help her. And so based on the record, we'd just like to submit that Reddy is eligible for asylum based on the past persecution she suffered, based on the fact that she was clearly targeted on account of her race and also because the government, in this case, they clearly didn't want to persecute her or her attackers. So thank you. Thank you. May it please the Court, I'm Manning Evans. I represent the respondent in this matter. The agency ruled there was neither past persecution nor harm based on a protected ground, and substantial evidence supports the first conclusion that past events did not rise to the level of persecution. Persecution is an extreme concept. Not every offensive act qualifies. And the Board could reasonably conclude that although the petitioner did suffer some If Petitioner had made clear from the onset application and testimony at the IJ hearing that her claim was solely based on her political opinion, that whatever happened to her was on account of political opinion, this would be a pretty straightforward case, wouldn't it? No, Your Honor, because the events in the past were not straightforward for the government. Well, that's correct. I mean, she never proved that she was politically active. You listen to questions. Sometimes the answer helps you. But that's not the case. Her claim is based on racial animus. That's correct. The DIA did not undertake an alternative examination of the theory underlying her claim of past persecution. They simply accepted what the IJ did, and his entire focus was on political opinion, wasn't it? Well, Your Honor, the IJ focused both on the level of persecution and on the nexus. And I would focus on whether or not there was evidence of past persecution here. Well, assume for the purpose of my question that it's correct that he did not look at racial animus. Would that in and of itself be a reason to send it back? I don't believe so, Your Honor. This Court has said that when the agency rules on multiple grounds and one ground is independently sufficient, then that's enough to uphold the agency decision. And I believe that that's what you have here. You have a situation where substantial evidence supports the Board's conclusion that the events in the past did not rise to the level of persecution. The one event that the petitioner described as happening to her involved the home invaders holding a knife to her and inappropriately touching her. It's an unfortunate event. There's no question about it. But this is a situation where the petitioner and her mother remained in the house for six months after these attacks, and there were two of them. The assailants in this case had no reputation. They were not known as killers. Their focus was on trying to get these people out of the house. It's an unfortunate situation, but their focus appears to be on the house, not on the individuals here. Well, I guess the question is, were they trying to get them out of the house because they're Indo-Fijians? Well, Your Honor, I would say that the references to their race in the course of the attacks suggest that that was definitely one of their motives. And under this Court's mixed motive jurisprudence, that appears to be one of their reasons. They did say in the course of that that they called her and her mother, quote, a bloody Indian, close quote, and said, quote, Fiji is not a place for Indians? Yes, Your Honor. Those words were said, and I do believe that it shows that there is a nexus between what these people were doing and the petitioner's race. But because the events in the past did not rise to the level of persecution, that is the ground on which the Court should deny the petitions for review. And there is substantial evidence in support of that. I think that the question about when threats, death threats, rise to a level of past persecution is an important question in this case. The petitioner cited three cases in support of the idea that in some cases death threats can constitute past persecution. This case is not like any of those. And those cases appear at page 16 of the original opening brief. The cases are Ruano, Cordon Garcia, and Mashiri. In all of these cases, you had assailants who were known either to be killers or they were invoking Germany's Nazi past in attacking neighbors. The situation here is far less organized. It's a random effort to obtain this particular property, not a focus on the petitioner here or her mother. So the government believes that this is not a case where the threat of death rises to the level of past persecution. There's no question that all of those incidents go to assessing whether or not there is a well-founded fear of future persecution. But the petitioner here is not entitled to a presumption that there's a well-founded fear because the past events did not establish persecution. Petitioner and her mother reported this attack to the local police, didn't they? Yes, they did, Your Honor. What did the police tell them? The police recorded the theft of the mother's jewelry and, I believe, the inappropriate touching, but declined to take a report regarding the effort to recover the property. Didn't one of the policemen say that they couldn't do anything because the land in Fiji belongs to native Fijians? Yes, Your Honor. And didn't they tell the woman and her mother that they were lucky nothing happened to them, that they weren't killed or raped? I believe that they did say that, Your Honor, and it's unfortunate. And did they follow up, the police? Your Honor, this is a situation where no one has ever identified the assailant. So the fact that there's no follow-up I don't think says very much about what the police were inclined to do, but there is no evidence of follow-up. As far as the question about whether or not there's a willingness or an ability to protect, the immigration judge actually did not rely or didn't discuss that particular component of the claim. She basically said that this is a criminal case. I think that she did overlook the references to race in the course of these attacks, but she really didn't make a finding, I think, that the police were either able to protect or not able. So I don't think that that's actually a basis on which the court has to decide this case. Regarding whether or not there is a well-founded fear of persecution, in this case, the attackers were after the property. All of the evidence shows that that's the case. And the petitioner and her mother left the property eight years ago. They leased it. They stripped off her blouse and fondled her? What does that have to do with the robbery? I'm sorry, Your Honor? Isn't that what happened in this case? Didn't they rip her blouse open and fondle her? Yes, Your Honor. There was an inappropriate touching in the course of one of the attacks. Okay. What does that have to do with robbery? It's clearly a different crime, an additional crime. The police did take a report regarding that. So you want to backtrack off your statement that they were solely there to rob? If I said that, I misspoke and did not include that particular event. And that happened as well. But my point is that the robbers were focused on trying to get people out of the property. And the property is long gone. There's no indication of any intention to return to the property or any right to return to the property. There's no indication that anyone is looking for Petitioner. Now, there is a letter from a cousin that accompanied the motion to reopen. And I would point out to the court that the cousin's letter does not say when the allegation that they are looking for Petitioner occurred. It doesn't say how the cousin knew this. It actually doesn't contain a threat against the Petitioner. And there's no explanation why eight years later anybody would be particularly interested in the Petitioner. I think that the Board was reasonable in saying that, as a result, Petitioner failed to show a material change in the conditions in Fiji, notwithstanding the latest coup. Now, coups, as the Court knows, have happened with some regularity in Fiji. But that really just shows that the claim that the Petitioner attempted to raise in her motion to reopen was very similar, if not the very same claim that she made. The Interpreter After the intrusion at the house, there were instances in which people threw rocks through their windows? Yes, Your Honor. I believe she said the ten times. The Interpreter And the testimony was that happened ten times? Yes, Your Honor. And sometimes with notes, I think, tied to the stones with death threats. The Interpreter Saying if you don't leave the land, you will be killed? Yes, Your Honor. Those things happened. The Interpreter Or words to that effect. At the same time, there's actually a passage where Petitioner describes stone-throwing as the equivalent of teasing. So whether or not that actually shows past persecution, the government's position is that it doesn't. It is relevant to showing future persecution, and there's no question about that. And if they had a right to go back to this land and they intended to go back to the land, then there would be a real problem here. There's no doubt about it. But there's no evidence of that in this case. There is no likelihood of or well-founded fear of persecution. And the government believes that the decision here is supported by substantial evidence. And that is the standard of review here. It's very important. I understand the Court might come to a different conclusion if it had this case before it on de novo review, but that's not the standard. Was there a suggestion in the record why they were focusing on this particular land or house? Not that I'm aware of, Your Honor. Not that I'm aware of. Aren't you basically saying that if they go back and gets any property, she's going to be saying things are going to happen again? Well, Your Honor, no. Isn't that pretty clear in this record? No, Your Honor. I don't believe it is. Because the evidence shows that whoever was going after this land is just as likely to go after anyone else's land. It's an unfortunate situation. And as the Court observed earlier, it's a random situation. It's not anyone else. I'm sorry. It's an Indo-Fijian, isn't it? It is just as likely that this could happen to any other Indo-Fijian as it could happen to Petitioner. I understand that. But it's a random matter. It's not any indication of any specific focus on this Petitioner. The Court mentioned earlier the pattern and practice claim. There's no claim of a pattern or practice in this case. There was mention of a disfavored group analysis. But I believe, as the Court mentioned, there does need to be some evidence of aliens being singled out. And here, that's not what's happening. The evidence shows that the assailants were looking at the land and not at the Petitioner. There's no indication of any identification of this Petitioner. Okay. You've used your time. Thank you. Thank you very much. Just real quickly. Here the Board denied the Board adopted and affirmed the judge's decision, not because the Board found that there was no past persecution. The judge denied because the Board thought there was just criminal acts by private individuals. However, here the government wrongly claims that these are just random acts of robbery or this is just a land dispute unconnected to any kind of nexus and that these are just death threats. Fiji has an unfortunate history of specifically targeting its Indian Fijian citizens. And this is corroborated also in the government's brief in their main case, which is SINGVINS, I believe on pages 10 through 12, which recognizes that there is a pattern in practice of ethnic Fijians targeting their Indian Fijian citizens. And it's important here when analyzing past persecution that you look at cumulative harms. Here it's not simply just one death threat or it's not one incident. It's Reddy and her mother repeatedly being attacked by ethnic Fijians. They're being intimidated in order for them to leave their land. And the reason why is because as stated in the Department of State's country reports, ethnic Fijians disfavor Indian Fijians owning the land. And this has been something they've been trying to do for many years. And as the cousin's letter also states, the people who eventually forced her off her land are now occupying her house as well. So Reddy and her mother can't simply return safely to Fiji, because as of today it still remains far too dangerous for them. And there's also been a coup, as the court has noted, in 2006. So this was an isolated incident, but a systematic pattern or practice of intimidation in order to force Reddy and her mother to leave the land because they were Indian Fijian landowners by ethnic Fijians. What do we have in this record specifically post-2006? It would be based on a motion to reopen. Yeah, but what is there about conditions post-2006? I believe the record only shows that there's been a coup by the military, and it was when the military overtook Fiji and it was a well-publicized event. The U.N. tried to reach out and tell Fiji to uphold human rights, and U.S. officials actually tried to go to Fiji to meet with the Fijian prime minister, but the prime minister refused, and conditions got so bad that the U.S. refused $2.6 million in aid to Fiji. So based on that, conditions in Fiji are still as dangerous as they were before. Excuse me. The case just argued is submitted for decision. The next case, Kumar v. Holder, is submitted on the briefs, and it is so ordered. We'll hear the next case for argument, which is Chanadarathum v. Holder. Thank you. Good morning. May it please the Court, my name is George Ferides, and I'm appearing on behalf of Petitioner Chanadarathum. In his appeal from the Board of Immigration Appeals, his decision denying his application for asylum, denying his appeal of his application for asylum, as well as his motion to reopen to pursue adjustment of status based on marriage to a United States citizen. This is a consolidated appeal, and I will be discussing the asylum appeal first. In the present case, the Board of Immigration Appeals issued a streamlined decision, and affirmed the IJ's decision without issuing a separate opinion. Therefore, we look to the immigration judge's decision, which Petitioner argues is not supported by substantial evidence. The immigration judge's decision, the immigration judge in this case issued an adverse credibility finding, which can be seen on pages 212 and 213 of the administrative record. The first point, the first factor that the immigration judge relied upon in denying this case, pursuant to an adverse credibility finding, was based on the initial admission by Petitioner regarding his membership in the Sam Ramsey party. He initially testified on direct testimony that he was a member of the Olympic Market Association, which is a local political organization in which he participated in opposition to the Communist Party of Cambodia. Petitioner argues that his initial admission in his direct testimony, as well as his admission in his asylum declaration of his membership in the Sam Ramsey party, is a minor omission in this case that should have no bearing on his credibility. The basis for this assertion is the fact that when we look at his testimony and his application as a whole, the persecution he suffered in Cambodia was based on his political activism and support for the local party, as opposed to the national Sam Ramsey party. This can be seen in pages 249 as well as 280 in the record, and is also supported further in the record in pages 284 to 285 and 291. In fact, in this case, Petitioner would argue that the inconsistencies cited by the immigration judge in fact do not exist. All we have in this case are omissions which are either reasonable or minor in nature that should have no bearing on credibility. What would happen in this case if we denied relief for asylum withholding, et cetera, but granted relief on the motion to reopen? Wonderful. Take me through the steps of what would happen mechanically. Mechanically? Well, the case would go back to the Board of Immigration Appeals on remand, and at that point there would have to be a hearing before the immigration judge solely for the purpose of adjudicating the Petitioner's adjustment of status application. The validity of the merit? Not the validity of the merit. That falls under the jurisdiction and authority of the United States Citizenship and Immigration Services who adjudicate the I-130 petition. The immigration judge solely adjudicates the I-485 application of adjustment of status. It is the United States Citizenship and Immigration Services which essentially decides if the marriage is bona fide and whether or not the classification requested should be granted. Do these go on separate tracks? That is the unfortunate thing, Your Honor. When a case gets before the agency, the I-485 application for adjustment of status cannot be filed with the service. It has to be filed in court. Now, the problem in these types of cases is usually you have to wait for the I-130 to be adjudicated. Sometimes if ---- Has that happened here? In this case, Your Honor, I regret to say that I am personally unaware of the status of this petition. If I had to guess, I don't want to guess. It's kind of important, isn't it? Yes, Your Honor. And you don't know that? I do not know that, Your Honor. The reason for this is because there's nothing in the record, number one. Number two, in our in-house file, we have no documentation of a decision in this case. There's no receipt number that we can track online, so it's very possible that the case is still pending even after all these years. It is not unusual for a case to be pending before the United States Citizenship and Immigration Services for this length of period, especially post-commencement of removal proceedings. What, in your opinion, did the DIA do wrong on the motion to reopen? Well, Your Honor, my first argument will always be that the Board of Immigration Appeals abuses discretion by failing to acknowledge that there was enough evidence in support of the marriage to necessitate a remand back to the Board of Immigration Appeals and then back to the immigration judge for a hearing for adjustment of status. But in this case, that's an argument that necessitates looking at the record and seeing and evaluating whether or not certain pieces of evidence are enough, and there's really no test for that. In this case, one might say that the Board of Immigration Appeals did not abuse its discretion. Another case might disagree. In this case, the marriage, the timing of the marriage was unfortunate for this applicant. If this marriage occurred in front of the immigration judge, chances are that the immigration judge would have continued proceedings to allow the United States Citizenship and Immigration Services to adjudicate the I-130. In this case, because there was a final order and this was a motion to reopen, and pursuant to matter of validity, an essential element must be proven by clear and convincing evidence. In this case, given the timing of the marriage, which was shortly before, I believe, the denial of the asylum appeal, the respondent only had 90 days to file his motion to reopen. And in this case, given the fact that he had only been married a short amount of time, he was limited in the amount of evidence that he could provide. But given that, it is Petitioner's argument that he submitted everything he could provide So he was caught between a rock and a hard place, essentially. If he waited any longer to file his motion, it would have been untimely, it would have been denied, and his only recourse would have been either to pursue consular processing abroad and apply for a waiver of the inadmissibility issues or seek a request with the Department of Homeland Security to join in the motion to reopen. But in lieu of those options, he decided to file his motion to reopen in a timely fashion and therefore submitted all the evidence that he had at his disposal. Okay, now would you, for my benefit, give me the answer to Judge Hawkins' question again? If we were to send this back on the reopening, this case has been pending in this Court for several years. Yes, Your Honor. Are you in touch with your client? Does this just go back and sit? No, Your Honor. It goes back to the immigration judge, and at that point, there would be a finding of whether or not the Respondent is eligible, I mean the Petitioner is eligible for adjustment status. Even though the application hasn't been? If it's still pending, Your Honor, then the proceedings would have to be stayed, either administratively closed or stayed or continued until that application is adjudicated. If it has been denied, then obviously the Board of Immigration Appeals will not remand it to the immigration judge. Your client doesn't have any notice? Your Honor? You said your files don't indicate anything. Not my in-house file, Your Honor. Has your client received any notice? No, Your Honor. It's not unusual for these cases to be pending this long. That's not what either of us are asking. Sorry, Your Honor. You just don't know? I do not know personally, Your Honor. I apologize, Your Honor. If it pleases the Court, I can submit. So we really don't know what's going to happen at this? We know that the Board of Immigration Appeals will not remand it without? If the application is pending, then they will remand it to the immigration judge. If it is not pending, then they will not remand it. Furthermore, there is no disadvantage to the government to have this case remanded because if there is something amiss with this application, the Department of Homeland Security has options available to it. If there is a problem with the marriage, they can request new charges of inadmissibility or removability to be placed on the record, which would have serious consequences for this petitioner if they are sustained. So it is not that the Department of Homeland Security would be submitting or would be disadvantaged by a remand of this case that would waste time because it could be that the penalty to the petitioner in these types of cases would be rather severe. Do you know whether your client is still married? No, Your Honor. I'm not personally aware of that fact. Okay. Thank you. We'll take another one. Thank you. May it please the Court. Teal Luthie Miller from the Department of Justice on behalf of the Attorney General. I'm going to start by focusing on the petition to reopen and answer to the extent I can. I have the same question that the Court has asked about whether the petition for the I-130 had been granted. And this is extra record, but I spoke to a contact at the Bureau of Customs and Immigration Service, and the file has been sent to the Central Archive in Missouri, which means it is not in processing any longer. It has not been granted. We don't know why that is. I was not able to establish that before the hearing this morning. I can go through, if it would be helpful to the Court, reasons why that might have happened. It could be, of course, the Central Archive. The Central Archive in Missouri. That's all I can tell you. I'm sorry. It could be that the petition was withdrawn. It could be that the petition was considered abandoned because notice was sent asking for further evidence or asking a petitioner to come in for fingerprinting or something like that, and it was never responded to, and the service considered it withdrawn or abandoned. I'm sorry. It also could be an error on behalf of the service, and they're sending the record to Washington so that we can look into it, but we do not know what has happened with the I-130 application. This is not your omission, but to me this is like arguing a criminal appeal and not knowing whether your client is still in jail. I mean, I just am dumbfounded by the lack of knowledge on the part of the petitioner. I just don't understand it. You can go ahead. Okay. Your Honor, I want to back up from that question, though, and still addressing the marriage question. I do think that the Board's determination that the not to reopen was not arbitrary, and that's the standard. You have to determine that it was an abuse of discretion that they felt the petitioner hadn't met the test for rebutting. There's a presumption that a marriage entered into during removal proceedings is fraudulent. A petitioner can rebut that presumption by showing clear and convincing evidence, and the Board's determination here that the evidence wasn't clear and convincing, I think, was not arbitrary. In the order denying rehearing, they list, they quote the, I mean, they cite the regulation, and then they say that, you know, he has to, well, he says specifically the respondent is required to provide evidence of joint ownership of property, joint tenancy of common residence, commingling of financial resources, affidavits from knowledgeable third parties as to legitimacy of the marriage, and any other documentation that's relevant. That sounds like they're saying they cite the reg, which says this is the kind of evidence he may offer, and then they have an or at the end of it for the last clause, and the Board cites the same reg and says, well, here's the evidence he has to show. He has to show A, B, C, D, and E. And, of course, he hasn't shown any evidence of joint ownership of the property. He's shown a joint utility bill, but that's not enough. I mean, are they really just screwing up the standard here? I don't think so, Your Honor. If you look at this Court's decision in Mali, what the ultimate thing that these  are supposed to be, and I'm quoting here, probative of the motivation for marriage, not just the bare fact of getting married. And so those sorts of evidence can be probative of that if they show that you were living in the same residence for a while. The Velarde decision, which is a decision by the Board, showed evidence that the Petitioner and his wife had known each other for four years and had born a child together. That was good enough to establish that the marriage was for some reason other than immigration fraud. My colleague's question, and I have the same question, is the use of the word required. That's not accurate, is it? I mean, it would be helpful in a case involving a disputed marriage or a determination of whether a marriage is bona fide or not to have this information, but the regs don't require it, do they? Well, Your Honor, I acknowledge that the Board used the word required, but I think if you look at the Board's full decision, what it was saying was he admitted some he submitted some evidence. It was applying the test from Molley. I think a fair reading of the Board's decision is it did say required, but it looked it listed appropriately the kinds of information that a Petitioner is supposed to submit. And then it said it identified the evidence he did submit and explained why he felt why, although they recognized it was some evidence of the marriage, it wasn't clear and convincing evidence. We should interpret the word required to mean should have, might have, could have? You should interpret the word required to look to apply. He is required to meet the burden of showing that the marriage was bona fide, and these are the types of things he could submit to meet that burden. That's what required is doing in that sentence. I would have thought your argument would have been even if they were wrong about that, it's clear that he didn't meet the standard. I think that's also my argument, Your Honor, as we've stated in our brief. I can address the claim for asylum if the Court would like. If there are no further questions. Thank you. Thank you. You have about 17 seconds, I think, 13 if you want to. I will also submit this case, Your Honors, unless you have any further questions. Thank you. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Canby, Hawkins